Terry Gross, terry@gba-law.com (SBN 103878)
Adam C. Belsky, adam@gba-law.com (SBN 147800)
Monique Alonso, monique@gba-law.com (SBN 127078)
GROSS BELSKY ALONSO LLP
One Sansome Street, Suite 3670
San Francisco, CA 94104
Telephone: (415) 544-0200
Facsimile: (415) 544-0201

Attorneys for Plaintiff Brian Bank
and the Proposed Class

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| BRIAN BANK, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>AMERICAN AIRLINES, INC., DELTA AIRLINES, INC., SOUTHWEST AIRLINES CO., and UNITED AIRLINES, INC.,<br><br>        Defendants. | Case No.<br><br>**ANTITRUST CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Brian Bank, individually and on behalf of all others similarly situated, and demanding trial by jury, upon information and belief complains and alleges as follows:

## NATURE OF THE ACTION

1.      This is an antitrust class action brought against the four major U.S.-based airlines, American Airlines, Inc., Delta Airlines, Inc., Southwest Airlines Co., and United Airlines, Inc. (collectively "Defendants") to recover for injuries sustained by the named plaintiff and members of the Plaintiff Class (collectively "Plaintiffs") to their business or property as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and California law.  Plaintiffs allege that the Defendants conspired to fix, raise, maintain, or stabilize the price of domestic airline tickets in the United States.  Plaintiffs seek actual damages, treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs also allege violations of California's Cartwright Act (Cal. Bus. & Prof. Code section 16700, et seq.) and Unfair Competition Law (Cal. Bus. & Prof. Code section 17200, et seq.) and seek treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees and to obtain restitution, and other available remedies from Defendants, respectively, pursuant to those statutes. The Plaintiff Class is defined more fully in Paragraph 21, below, and consists of all persons or entities who directly purchased domestic airline tickets from one or more of the Defendants between July 2011 and the present (the "Class Period").

2.      The four Defendants direct over 80% of the flights to, from and within the United States.  Plaintiffs allege that the Defendants carried out their conspiracy through a variety of means.  This conspiratorial activity included restricting the seating capacity on flights within the United States; limiting the number of flights offered within the United States; and controlling the transparency of pricing information available to domestic airline ticket consumers regarding flights within the United States.  Plaintiffs paid higher prices for their domestic airline tickets as a result of the Defendants' coordinated conduct.

3.      In July 2015, the United States Department of Justice ("DOJ") sent civil

investigative demands ("CIDs") to each of the Defendants. A representative of the DOJ stated that the DOJ was investigating "possible unlawful coordination" among the airlines.

4. Plaintiffs paid higher prices for domestic airline tickets than they would have paid absent the concerted unlawful activity alleged herein and described in further detail below. Plaintiffs seek damages, and other available relief, for the inflated domestic airline ticket prices which they paid.

## JURISDICTION AND VENUE

5. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and to enjoin further violations. This action is also instituted under California's antitrust and unfair competition laws; respectively Cal. Bus. & Prof. Code section 16700, et seq., and section 17200, et seq.

6. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

7. This Court has personal jurisdiction over the Defendants because each (a) transacted business in this District; (b) directly sold and delivered passenger air transportation in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

8. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

9. The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## INTRADISTRICT ASSIGNMENT

10. Intradistrict assignment to the San Francisco Division is appropriate. The practices at issue adversely affect airline ticket consumers who reside in this Division. Additional related class actions have been filed in this Division.

## PARTIES

11. Plaintiff Brian Bank is a resident of the State of California who, during the Class Period, purchased one or more domestic airline tickets for travel on one or more of the Defendants' airlines and thereby suffered injury.

12. Defendant American Airlines, Inc. ("American") is a Delaware corporation with headquarters in Fort Worth, Texas. American is a subsidiary of American Airlines Group, Inc., also based in Fort Worth. American Airlines Group, Inc. is also the holding company controlling US Airways, which merged with American in 2013.

13. Defendant Delta Airlines, Inc. ("Delta") is a Delaware corporation with its principal place of business in Atlanta, Georgia.

14. Defendant Southwest Airlines Co. ("Southwest") is a Texas corporation with its headquarters in Dallas, Texas.

15. Defendant United Airlines, Inc. ("United") is a Delaware corporation with headquarters in Chicago, Illinois. United is a wholly owned subsidiary of United Continental Holdings, Inc., a Delaware corporation also headquartered in Chicago. In 2013, United merged with Continental Airlines.

16. "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold domestic airline tickets in interstate commerce in the United States during the Class Period.

17.     To the extent that subsidiaries and divisions within Defendants' corporate families sold domestic airline tickets, these subsidiaries played a material role in the conspiracy alleged in this Complaint.  Further, each of the corporate parents took profits from their wholly-owned or controlled subsidiaries or affiliates that sold domestic airline tickets, including profits from the conduct herein alleged and generally shared facilities, management and personnel.  Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing and directly or indirectly collecting monies from Plaintiffs for domestic airline tickets was known to and approved by their respective corporate parents named as Defendants in this Complaint.

## CO-CONSPIRATORS, CORPORATE LIABILITY AND AGENCY

18.     Various other persons, firms and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  The Defendants are jointly and severally liable for the acts of their co-conspirators, whether named or not named, as Defendants in this Complaint, and Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

19.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

20.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common conduct alleged herein.

## CLASS ACTION ALLEGATIONS

21.     The named plaintiff brings this action on behalf of himself and as a class action under the provisions of Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3) on behalf of the members of the following Class:

> All persons and entities who purchased domestic airline
> tickets directly from one or more Defendants during the

> Class Period.  Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint and all governmental entities, and any judges or justices assigned to hear any aspect of this action.

22.   <u>Class Identity</u>:  The Class is readily identifiable and is one for which records should exist.

23.   <u>Numerosity</u>:   Due to the nature of the trade and commerce involved, Plaintiffs believe that there are likely many hundreds of thousands of Class members as above described, the number and their identities being known to Defendants and their Co-conspirators.

24.   <u>Typicality</u>:  The named plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiffs directly purchased domestic airline tickets from one or more of the Defendants.  The named plaintiff and the other members of the Class were damaged by the same wrongful conduct of the Defendants and the relief sought is common to the Class.

25.   <u>Common Questions Predominate</u>:  There are questions of law and fact common to the Class, including:

a.     Whether Defendants conspired, contracted or combined with others, for the purpose and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of domestic airline tickets sold in the United States;

b.     Whether Defendants' conduct violated federal antitrust laws;

c.     Whether Defendants' conduct caused the price of domestic airline tickets sold in the United States to be artificially high and at supracompetitive levels; and

d.     The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e.     Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1; the Cartwright Act, Cal. Bus. & Prof Code §16700, et seq. or the Unfair Competition Law, Cal. Bus. & Prof Code §17200, et seq.;

f.     Whether the conduct of Defendants and their co-conspirators, as alleged in

this Complaint, caused injury to the business or property of the Plaintiffs;

g. The appropriate class-wide measure of damages;

h. The appropriate amount of class-wide restitution; and

i. The nature of class-wide equitable or injunctive relief.

26. These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

27. <u>Adequacy</u>: The named plaintiff will fairly and adequately protect the interests of the Class in that his interests are aligned with, and not antagonistic to, those of the other members of the Class and he has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent himself and the Plaintiff Class.

28. <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all Class members is impractical. Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Absent a class action, it would not be feasible for Class members to redress the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Management of this action as a class action poses no material difficulty. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

29. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## TRADE AND INTERSTATE COMMERCE

30. The conduct of the Defendants has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that,

a.     Defendants have sold domestic airline tickets throughout the United States;

b.     Defendants have each used instrumentalities of interstate commerce to sell domestic airline tickets throughout the United States;

c.     The conspiracy alleged herein has affected billions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiffs and other entities who are themselves engaged in commerce.

## FACTS

### The Domestic Airlines Industry

31.     The domestic airline passenger industry currently consists of a highly concentrated market. As a result of a series of recent mergers, Defendants American, Delta, United and Southwest, the four largest airlines in the United States, now control approximately 80% of the domestic airline market. The most important mergers began in 2005 with the merger between US Airways and America West. In 2008, Delta and Northwest Airlines merged. In 2010, United and Continental merged. In 2011, Southwest and AirTran merged. In 2013, American and US Airways merged, creating the largest airline in the world.

32.     According to the United States Department of Transportation's Bureau of Transportation Statistics, the average domestic airfare rose at an inflation-adjusted 13 percent from 2009 to 2014. As discussed further below, much of this rise in prices results directly from Defendants' mutual commitment to keep airline capacity artificially low. Defendants also engaged in a concerted campaign to reduce consumers' ability to compare air fares by limiting online travel agencies' ("OTAs") access to fare data and by forcing consumers to use Defendants' websites rather than other retail channels for domestic airline tickets.

33.     In December 2014, United States Senator Charles E. Schumer (D-NY) requested a federal investigation into United States airlines.  As Senator Schumer stated: "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity. . . .  The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather."  Senator Schumer also stated that airlines were set to make a profit of $7.08 per passenger in 2015, up from $6.02 in 2014 and $3.38 in 2013.

34.     Despite the fall in fuel prices, Defendants' fares have not decreased.  It has been estimated that in April of 2015, United States airlines paid $1.94 a gallon for jet fuel, a decrease of 34 percent from the previous year. One would expect that in a competitive industry, airfares would decrease as a result, while airlines sought to obtain greater market shares. That has not happened. "The idea that U.S. airlines would, once again, devolve into a war for market share is founded on a misunderstanding of the new structure of U.S. airlines," Vinay Bhaskara, an industry analyst, wrote in Airways News. "We are unquestionably living with an air travel oligopoly." He added that "[r]emember, this is the same management group that (instead of allowing passengers to reap a modest reduction in fares) responded to the F.A.A.'s inability to collect taxes in mid-2011 by gleefully raising base fares to where total out-of-pocket costs were exactly the same (earning a windfall of $28.5 million per day)."

35.     The United States Department of Justice also raised issue with industry consolidation and the price of fares when it questioned, though ultimately approved, the merger of American and U.S. Airways in 2013.   Specifically, the DOJ noted at the time that "[t]he structure of the industry is already conducive to coordinated behavior."  As one example, the DOJ noted that airlines closely watch each other's fares and consistently match each other's fare increases.  As another example, the DOJ pointed to the use of "cross-market incentives" ("CMIs") to deter fare wars.  "A CMI occurs where two or more airlines compete against each other on multiple routes.  If an airline offers discounted fares in one market, an affected

competitor often responds with discounts in another market – a CMI – where the [original] discounting airline prefers a higher fare. CMIs often cause an airline to withdraw fare discounts." The airline industry is now structured so that, to the extent there is an understanding or agreement to act in coordinated ways, airline competitors would be (and are) able to punish each other quickly for breaking from the pack.

36. The airline industry also has very significant barriers to entry, given, at least, the need for government clearance to operate an airline along approved flight paths, the high cost of building out an airline fleet, the finite number of gates at airports throughout the nation, and the difficulty in obtaining constant access to such gates.

37. Collusion in the industry is also made easier by Defendants' membership in trade associations, including, among others, Airlines for America and the IATA. There is also a history of direct communication with each other regarding competitive issues, and the industry has a powerful network of financial analysts and other channels through which they can send messages to each other.

38. On July 24, 2015, *The Wall Street Journal* reported that the United States Department of Transportation had initiated an investigation of the five largest United States airlines including the four Defendants. According to the article, the Department of Transportation was investigating price gouging by the airlines after a recent disruption of train service in the northeast corridor following a major rail accident. This appears that it may yet be another example of the Defendants acting collusively at the expense of American consumers.

**Capacity Discipline is A Key to Defendants' Plans**

39. It is through a process known as "Capacity Discipline," that the Defendants are able to limit the number of seats and flights available to the consuming public. The Defendants' methodology of offering higher fares for the limited number of seats available has led the cost of airline tickets to reach supra-competitive levels. By jointly working at enforcing Capacity Discipline, the Defendants are able to limit the choices available to consumers in the United States. If it was only one airline that was limiting its seating capacity on specific routes, the

consuming public could easily switch to another airline which was interested in selling more tickets on those routes. However, when the Defendants work together to limit capacity, as they do here, that the consuming public has no choice, other than not to fly, but to pay higher fares.

40. According to a June 20, 2015 article in *Forbes*, Delta Airlines raised its capacity by only 1% during 2009-2013. United lowered its flying capacity from 253 billion miles in 2011 to 245 billion miles in 2013. American also did not add significant flying capacity to its network during this period. As the Defendants maintained steady flying capacity, or even lowered it, even as demand for air travel rose driven by the economic recovery, overall industry air fares increased.

41. Defendants also made it known to each other that they remained committed to this agreement by publicly discussing their plans to continue exercising "capacity discipline." For example, Jeff Sismek, the CEO of United, discussed United's $2 billion profits in 2014 and stated, "[w]e will absolutely not lose our capacity discipline . . . . It's very healthy for us and very healthy for the industry."

42. In announcing Delta's 2014 fourth quarter results, Delta's chief executive, Richard Anderson, stated, "As we begin 2015, we have a significant opportunity from lower fuel prices, which will drive more than $2 billion in fuel savings over 2014. Through our capacity discipline, pricing our product to demand, and the fuel savings, we expect to drive double-digit earnings growth, along with increased free cash flow and a higher return on invested capital in the upcoming year."

43. Delta's Anderson (echoing the comments of United's Smisek cited above) also recently stated: "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices. . . . In fact, we continue to trim capacity on the margin to maintain yields."

44. Prior to its merger with US Airways, American had planned to compete with the other Defendants and expand domestically and internationally, adding additional flights and service on nearly 115 new routes. However, after the merger, American dropped that plan, and instead chose to fall in line with its competitors by exercising Capacity Discipline.

45.     American's president, Scott Kirby, confirmed this at an investment conference on March 3, 2015 stating that the company would not be adding capacity through the production of additional airplanes: "[A]lmost all of our capacity growth domestically is about putting more seats on airplanes."  However, this kind of capacity increase is minimal and still permits the airline to charge higher rates because there are no additional flights.

46.     American's Kirby recently confirmed that the Defendants were only interested in increasing capacity through putting a relatively small number of additional seats onto its existing airplanes: "All airlines for the most part are putting more seats on airplanes. We're doing it. United's doing it. Delta's doing it. Even Southwest is continuing to put more seats on their existing aircraft. Once you've done that, you're done."

47.     Recently, when it appeared that one of the Defendants might break from the capacity limitation conspiracy, the response of the industry was rapid.  On May 20, 2015, Gary C. Kelly, the CEO of Southwest, announced a break from the industry stance on discipline, stating that Southwest planned to increase its capacity by as much as eight percent by acquiring two new gates at its hub at Love Field, Dallas.  Almost immediately, the stock prices of the other Defendants plummeted.  Raymond James analyst Savanthi Syth wrote in response to the shift, in a research note: "understandably, investors are questioning if this signals the end of the era of industry capacity discipline."  Additionally, Wolfe Research airline analyst Hunter Keay stated: "Domestic capacity discipline has effectively vanished."

48.     Soon thereafter, the IATA's annual meeting took place on June 7-9, 2015 in Miami, Florida.  The chief executives of many of the leading airlines were in attendance.  During the meeting, several of them spoke publicly about the need for "discipline" within the industry. For example, Delta's President, Ed Bastian, said that Delta is "continuing with the discipline that the marketplace is expecting."  American's chief executive, Douglas Parker, stated that the airlines had learned their lessons from past price wars, noting that "I think everybody in the industry understands that."

49.     On June 11, 2015, the *New York Times* published an article titled "'Discipline' for Airlines, Pain for Fliers," in which the author, James B. Stewart, commented: "Discipline is classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins. This year, that discipline seems to be working: the IATA projected this week that airline industry profits would more than double this year to nearly $30 billion, a record." *The New York Times* also reported: When airline industry leaders say they're going to be disciplined, "they mean they don't want anyone to expand capacity," said Fiona Scott Morton, professor of economics at Yale and a former deputy attorney general in the antitrust division of the Justice Department. "And when there aren't enough seats, airlines raise prices. That's what we've been seeing."

50.     The statements of the various airline executives and the obvious pressure placed on Southwest at the International Air Transport Association ("IATA") meeting had the desired anti-competitive effect. *The New York Times* article also noted, "after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue. 'We have taken states this week to begin pulling down our second half 2014 to manage our 2015 capacity growth . . .' Kelly said."

### Defendants Coordinate to Reduce Price Transparency

51.     The Defendants have also targeted online travel agencies ("OTAs") and websites offering information on competing fares. By providing comparisons among different airlines' prices for the same routes, OTAs and websites offering competing fares facilitate price transparency. On information and belief, each of the Defendants have demanded that OTAs, both large and small, agree to one-sided contractual arrangements that would prevent the OTAs from providing accurate price comparisons for consumers or add on fees to consumers for using OTA services that would erase any benefit to having the price transparency that OTAs provide. The Defendants' efforts to restrict the OTAs' ability to provide such comparisons and price reductions is a clear attempt to drive up prices.

52.     On information and belief, Defendants have also engaged in coordinated efforts to limit the effectiveness of online airfare websites. These efforts include at least: prohibiting such

CLASS ACTION COMPLAINT

sites from referring consumers to an OTA for booking a flight; prohibiting OTAs from providing airline information to airfare websites; prohibiting global distribution systems ("GDSs") from providing airline price and schedule information to "unauthorized" airfare websites; refusing to pay airfare websites for direct referrals to the airline's own booking website; and prohibiting airfare websites from displaying price information of the airline.

### The Department of Justice Initiates Its Investigation

53. On July 1, 2015, a variety of news outlets reported that the DOJ had sent civil investigative demands ("CIDs") to a number of airlines the day before. A spokesperson for the DOJ, Emily Pierce, confirmed this report, stating that the DOJ was investigating "possible unlawful coordination" to limit capacity increases, thereby keeping ticket prices high. All four Defendants have publicly confirmed that they received CIDs from the DOJ.

54. According to the DOJ's Antitrust Division Manual, last updated in April 2015, before a CID is issued, a section or field office must be authorized to conduct a preliminary investigation into a potential antitrust violation. In order to obtain authorization for a preliminary investigation, several factors are considered, the first one being "whether there is reason to believe that an antitrust violation may have been committed." Ch. III § B(1). Furthermore, "[i]n a civil matter, from the outset, attention should be given to the legal theory, relevant economic learning, the strength of likely defenses, any policy implications, the potential doctrinal significance of the matter, and the availability of an effective and administrable remedy. The greater the potential significance of the matter, the more likely the request to open an investigation will be approved." Id.

### Economic Evidence Demonstrates the Defendants' Conspiracy

55. The average domestic flight in 2014 cost $392, the highest annual fare since the Department of Transportation began collecting air fare records in 1995 and 2.5 percent higher than the previous high of $382 in 2013. See http://www.rita.dot.gov/bts/press_releases/bts021_15. When adjusted for inflation, fares are at a 12-year high.

56. Defendants' coordinated lack of price competition also reveals itself in the way that domestic airline ticket prices not been reduced in response to recent dramatic decreases in fuel costs. Because fuel is the largest operating cost for airlines, lower fuel costs should result in lower fares in a competitive market. However, Defendants' ticket prices have not been lowered, but instead have increased, as the price of fuel has dropped during the past four years. As long as capacity is artificially limited, there is no incentive for airlines to reduce fares, no matter how low fuel prices go.

## ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

57. Plaintiffs did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to the 2015 comments cited in this complaint. Before Defendants' recent coordinated statements regarding "capacity discipline," it was not reasonably apparent that they were each engaged in the same anti-competitive practices.

58. Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to the Plaintiffs. These violations constitute injurious acts that restart the applicable statute of limitations each time they are committed.

59. In addition, Defendants' and their co-conspirators' agreement, understanding, and conspiracy in violation of the antitrust laws was kept secret. As a result, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying supracompetitive prices for domestic airline tickets throughout the Class Period. Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

60. Plaintiffs did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators

1  used deceptive and secret methods to avoid detection and to affirmatively conceal their

2  violations.

3       61.    Neither Defendants nor their co-conspirators told Plaintiffs that they were fixing

4  prices, or engaging in the other unlawful collusive practices alleged herein. By its very nature,

5  Defendants' and their co-conspirators' conspiracy was inherently self-concealing.

6  **ANTITRUST IMPACT AND DAMAGES**

7       62.    Defendants' unlawful conspiracy has had at least the following effects:

8          a.  Prices charged by Defendants to Plaintiffs for domestic airline

9  tickets were artificially fixed, raised, stabilized and maintained at artificially inflated and supra-

10 competitive levels in the United States;

11         b.  Plaintiffs paid more for domestic airline tickets than they would have

12 paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive

13 and unlawful activities;

14         c.  Competition in the sale of domestic airline tickets was restrained,

15 suppressed and eliminated in the United States; and

16         d.  As a direct and proximate result of Defendants' illegal combination,

17 contract or conspiracy, Plaintiffs have been injured in their respective businesses and property, in

18 amounts according to proof at trial.

19 **CLAIMS FOR RELIEF**

20 **COUNT 1**<br>**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

21      63.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

22 allegation set forth in the preceding paragraphs of this Complaint.

23      64.    Beginning no later than July 2011 and continuing to the present, the exact dates

24 being unknown to Plaintiffs, Defendants entered into a continuing agreement, combination and

25 conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for

26 domestic airline tickets in the United States, in violation of Section 1 of the Sherman Act, 15

27 U.S.C. §1.

28

16<br>CLASS ACTION COMPLAINT

65.     The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among the Defendants, in furtherance of which the Defendants fixed, raised, maintained, and/or stabilized prices for domestic airline tickets in the United States.  Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

66.     The Defendants' contract, combination, agreement understanding or concerted action occurred in or affected interstate commerce.  The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among themselves.

67.     Where, as here, Defendants have engaged in a per se violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required.  To the extent such allegations may otherwise be necessary, the relevant market for purposes of this action is domestic airline tickets.  The relevant geographic market is the United States. The Defendants possess market power in the market for domestic airline tickets. Collectively, they control roughly 80% of that market.

68.     As a result of Defendants' unlawful conduct, prices for domestic airline tickets were raised, fixed, maintained and stabilized in the United States.

69.     As a proximate result of the Defendants' unlawful conduct, Plaintiffs have suffered injury in that they have paid supra-competitive prices for domestic airline tickets. Plaintiffs will continue to be injured in their business and property by paying more for domestic airline tickets sold by Defendants than they would pay in the absence of the contract, combination or conspiracy.

70.     With respect to their claim under the Sherman Act, Plaintiffs seek actual damages, injunctive relief, treble damages and attorneys' fees and costs.

**COUNT 2**
**Violation California Cartwright Act**
**(Cal. Bus. & Prof. Code section 16700, et seq.)**

71.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

72.     This Count 2 is alleged on behalf a of a California sub-class consisting of:

All persons or entities residing in California who directly purchased domestic airline tickets sold by Defendants from July 2011 to the present.   Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this litigation. ("The California Sub-class").

73.     Defendants' conduct has occurred in substantial part in the State of California and is also violative of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 et seq.), which prohibits combinations of two or more persons' capital, skill, or acts to restrict trade or commerce.  Such schemes are viewed as per se violations of the Cartwright Act. *Mailand v. Burckle*, 20 Cal. 3d 367 (1978).

74.     Plaintiffs paid supra-competitive, artificially inflated prices for domestic airline tickets.

75.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property in that they paid more for domestic airline tickets than they otherwise would have paid in the absence of that conduct.

76.     Defendants' unlawful conspiracy, and the conduct of the Defendants  in implementing it,  violate  the  Cartwright  Act  and  should  be  enjoined accordingly.

77.     As a result of the Defendants' violation of the Cartwright Act, the Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees. See Cal. Bus. & Prof. Code § 16750(a).

**COUNT 3**
**Violation California Unfair Competition Law**
**(Cal. Bus. & Prof. Code section 17200, et seq.)**

78.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

79.     This Count 3 is alleged on behalf of the California sub-class.

80.     Defendants' conduct has occurred in substantial part in the State of California. California's Unfair Competition Law ("UCL") (Cal. Bus. and Prof. Code §§ 17200 et seq.) prohibits acts of unfair competition, which mean and include any "unfair . . . business practices."

81.     Defendants' conduct constitutes "unfair" business acts and practices because Defendants' practices have caused and are "likely to cause substantial injury" to Plaintiffs which injury is not "reasonably avoidable" by Plaintiffs and is "not outweighed" by the practices' benefits to Plaintiffs.

82.     As more fully described above, the purpose and effect of Defendants' conspiracy was and is to eliminate the competition promoted by the UCL. Defendants' anticompetitive conduct constitutes unfair business acts or practices within the meaning of the UCL in that the justification for Defendants' conduct is outweighed by the gravity of the consequences to the general public and because the claim is tethered to a clearly articulated public policy.

83.     Plaintiffs have been and are unable to avoid injury, as Defendants maintain a market share in excess of 80% in the domestic airline ticket market. Plaintiffs are virtually required to purchase domestic airline tickets from the Defendants.

84.     Defendants' policies are contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.

85.     Independently of prohibiting acts of "unfair" competition, the UCL also prohibits "unlawful" business acts or practices. The conduct alleged in this Complaint is unlawful since it violates the Sherman Act and the antitrust laws of California. This unlawful conduct has significantly harmed Plaintiffs.

86.     Plaintiffs have suffered injury in fact and have lost money as a result of Defendants' unfair competition and violations of law in that they paid more for domestic airline tickets than they would have paid in the absence of the Defendants' unlawful conduct. They are therefore entitled to the relief available under the UCL as detailed herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging and decreeing that:

A.      This action may proceed as a class action, with Brian Bank as the designated Class representative (and where appropriate, subclass representatives) and his counsel as Class Counsel;

B.      Defendants have engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act and the UCL, and that Plaintiffs (or where appropriate, subclasses) have been injured in their business and property as a result of Defendants' violations;

C.      Plaintiffs recover damages sustained by them as provided by the federal antitrust laws and the California Cartwright Act as well as equitable relief including restitution under the UCL, and that a judgment in favor of Plaintiffs be entered against the Defendants in an amount to be trebled to the extent such trebling is permitted by such laws;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

E.      Plaintiffs be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      Plaintiffs recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      Plaintiffs receive such other or further relief as may be just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.


Dated: August 12, 2015           GROSS BELSKY ALONSO LLP


By:   /s/ Adam C. Belsky    .
         Adam C. Belsky

Attorneys for Plaintiff BRIAN BANK
and the Proposed Class